# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

|  |  |
|---|---|
| ELDERBERRY OF WEBER CITY, LLC, | CASE NO. 6:12-cv-00052 |
| *Plaintiff,* | |
| v. | MEMORANDUM OPINION |
| LIVING CENTERS – SOUTHEAST, INC., ET AL., | JUDGE NORMAN K. MOON |
| *Defendants.* | |

Plaintiff Elderberry of Weber City, LLC ("Elderberry") filed this action alleging one count of breach of a lease agreement against Living Centers – Southeast, Inc. ("Living Centers); FMSC Weber City Operating Company, LLC ("FMSC"); and ContiniumCare of Weber City, LLC ("Continium") (collectively, the "Continium Defendants"), and a separate count for breach of contract against Mariner Health Care, Inc. ("Mariner"). Mariner, Continium, and FMSC have separately filed motions for summary judgment, and Elderberry has filed a motion for partial summary judgment. For the following reasons, I will deny each of these motions.

## I. BACKGROUND

On November 8, 2000, Elderberry Nursing Home, Inc. and Living Centers entered into a Lease Agreement (the "Lease") under which Living Centers agreed to operate a long-term skilled nursing facility on a piece of property in Weber City, Virginia. Elderberry acquired the property that was the subject of the Lease from Elderberry Nursing Home, Inc. on December 20, 2004. At that time, Living Centers operated the nursing home on the property subject to the

terms of the Lease. During the leasehold, Elderberry and Living Centers negotiated for the expansion of the nursing home to a 90-bed facility.

In 2006, Elderberry and Continium agreed that the planned expansion would be funded by Elderberry, and the parties negotiated an amendment to the Lease (the "Lease Amendment") that extended the lease term for ten years and provided for two five-year extension options. The Lease Amendment specifically stated that Elderberry acquired Elderberry Nursing Home, Inc.'s rights under the original Lease. As part of the negotiations of the Lease Amendment, Living Centers requested the ability to assign the Lease and the Lease Amendment to Family Senior Care Holdings, LLC, or to any of that entity's subsidiaries or affiliates. In exchange, Elderberry requested that Mariner, the parent company of Living Centers, execute a Lease Guaranty Agreement upon such assignment of the Lease. The Lease Agreement indicates that C.L. Christian III signed it on June 26, 2006, on behalf of Elderberry, and Boyd P. Gentry signed it on July 5, 2006, in his capacity as Vice President of Living Centers. At the same time that Gentry signed the Lease Agreement, he also signed a document entitled "Lease Guaranty" (the "Guaranty"), which was attached to the Lease Amendment as Exhibit E. The signature block on the Guaranty indicates that Gentry signed that document in his capacity as Executive Vice President and Chief Financial Officer of Mariner.

Elderberry alleged in its Complaint that Living Centers assigned the Lease and the Lease Amendment to FMSC, an affiliate of Family Senior Care Holdings, LLC, sometime between July 2006 and April 2007.[1] In its summary judgment briefing, however, Elderberry argues that

---

[1] Living Centers and FMSC originally admitted in their Answer that Living Centers assigned the Lease and Lease Amendment to FMSC. On June 28, 2013, however, the Continium Defendants moved to amend their Answer to state that "Defendants are without knowledge regarding the allegations in Paragraph eighteen (18) of the Complaint [regarding assignment] and therefore deny same." Since Federal Rule of Civil Procedure 15(a)(2) provides that courts should freely grant leave to amend pleadings, and since Elderberry filed no objection to the Continium Defendants' Motion for Leave to Amend, I granted the motion to amend on July 16, 2013.

documents disclosed during discovery show that Living Centers assigned the Lease to FMSC prior to signing the Lease Amendment. In any case, the parties agree that FMSC began operating the nursing home facility in 2006, and improvements to the property funded by Elderberry were completed in April 2007. Pursuant to paragraph 5(1) of the Lease Amendment, the ten-year term of the Lease was scheduled to reset and begin on "the first day of the calendar month following the Completion of Construction," which was May 1, 2007.

On September 9, 2011, counsel for FMSC sent a letter to Elderberry stating that FMSC, which had been operating the Weber City nursing home since 2006, intended to assign the Lease to Continium.[2] Continium began paying rent to Elderberry in November 2011, and continued to pay rent monthly as due under the terms of the Lease and the Lease Amendment until March 2012. Neither Continium nor any other defendant has paid rent since. On April 16, 2012, Elderberry sent written notice to Ted Duay of Family Senior Care that the rent payment due on April 1, 2012, was past due. On July 19, 2012, Elderberry received notification that the Virginia Department of Health & Human Services, Centers for Medicare & Medicaid Services ("VDHHS") was terminating the Medicare Provider Agreement of Continium as a result of certain failures of Continium to operate the facility in conformance with VDHHS regulations, and on account of other deficiencies. Continium ceased all operations in the facility in August 2012.

Elderberry sent a letter to Living Centers, Continium, Mariner, and The Bernstein Law Firm on August 15, 2012, demanding payment of past-due rent and notifying all parties that if Elderberry did not receive payment within seven days of the notice, Elderberry would terminate the Lease and pursue remedies in court if necessary. On August 24, 2012, Elderberry sent

---

[2] Counsel who sent the September 2011 letter on behalf of FMSC also represents Mariner and the Continium Defendants in this matter.

another letter terminating the lease to the same four recipients.  A week later, on August 31,

2012, Mariner filed a declaratory judgment action against Elderberry in the U.S. District Court

for the Northern District of Georgia, seeking a declaration that the Guaranty is void under

Georgia law.  On September 27, 2012, Elderberry moved to dismiss the Georgia action and filed

this action the same day.[3]  The Court heard oral argument regarding all pending summary

judgment motions on July 3, 2013.

## II. LEGAL STANDARD

Summary judgment under Rule 56 should be granted if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

*see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "As to materiality . . . [o]nly

disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  If the evidence of a genuine issue of material fact "is merely colorable or is not

significantly probative, summary judgment may be granted."  *Id.* at 249–50.

In considering a motion for summary judgment, a court must view the record as a whole

and draw all reasonable inferences in the light most favorable to the non-moving party.  *Reeves*

*v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  The party seeking summary

judgment bears the burden of showing an absence of evidence to support the non-moving party's

case.  *Celotex*, 477 U.S. at 325.  If the moving party sufficiently supports its motion for summary

judgment, the burden shifts to the non-moving party to set forth specific facts illustrating genuine

issues for trial.  *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (citation omitted).  On

---

[3] The Northern District of Georgia ultimately transferred the Georgia case to this Court, which consolidated the two cases on July 16, 2013.

those issues for which the non-moving party has the burden of proof, it is his or her responsibility to oppose the motion for summary judgment with affidavits or other admissible evidence specified in the rule. Fed. R. Civ. P. 56(c); *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993); s*ee also Cheatle v. United States*, 589 F. Supp. 2d 694, 698 (W.D. Va. 2008) ("Indeed, the non-moving party cannot defeat a properly supported motion for summary judgment with mere conjecture and speculation.") (citation omitted). The court's role is to determine whether there is a genuine issue based upon the facts, and "not . . . weigh the evidence and determine the truth of the matter." *Anderson,* 477 U.S. at 249. Ultimately, the trial court has an "affirmative obligation" to "prevent 'factually unsupported claims [or] defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323–24).

## III. DISCUSSION

### A. Mariner's Motion for Summary Judgment

Mariner argues that the Guaranty is void as a matter of law because "it fails to include essential and necessary terms including the principal indebtedness, the creditor, the principal debtor, and identifying information which would identify the lease which Mariner allegedly guaranteed." There is a preliminary question of what law to apply in determining the validity of the contract—Georgia law or Virginia law. Although Elderberry argues that the Guaranty incorporates the choice of law provision contained in the Lease selecting Virginia law as the governing law, nothing in the Guaranty supports such a conclusion. In fact, the Guaranty contains its own choice of law provision, which is blank. Since the Court is exercising its diversity jurisdiction in this matter, I conclude that Virginia's choice of law rules determine what law governs the validity of the Guaranty. *See, e.g.*, *Sokolowski v. Flanzer*, 769 F.2d 975 (4th Cir.

1985) ("[I]n diversity cases a federal district court must apply the conflict of laws rules of the forum state.") (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494, 496 (1941)).

"In Virginia, while questions of breach are determined by the law of the place of performance, the validity, interpretation, or construction of a contract is governed by the substantive law of the *lex loci contractus*—the place of contracting." *O'Ryan v. Dehler Mfg. Co., Inc.*, 99 F. Supp. 2d 714, 718 (E.D. Va. 2000) (citing *Lexie v. State Farm Mut. Auto. Ins. Co.*, 469 S.E.2d 61, 63 (Va. 1996)); *see also Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 409, 419 (4th Cir. 2004). A contract is made when the last act necessary to complete it is performed. *Seabulk*, 377 F.3d at 419; *O'Ryan*, 99 F. Supp. 2d at 718. That act took place when Gentry signed the Guaranty in Georgia. *See John Deere Const. Equip. Co. v. Wright Equip. Co., Inc.*, 118 F. Supp. 2d 689, 692 (W.D. Va. 2000) (citing *Christian v. Bullock*, 205 S.E.2d 635, 638 (Va. 1974)). Thus, Georgia law applies in determining whether the Guaranty is a valid contract.

Under the Georgia statute of frauds, codified in Georgia Code § 13-5-30(2), a "promise to answer for the debt, default, or miscarriage of another" must be in writing. Furthermore, Georgia Code § 10-7-3 provides that the "contract of suretyship is one of strict law; and the surety's liability will not be extended by implication or interpretation." In *Sysco Food Services v. Coleman*, 489 S.E.2d 568, 569, 571 (Ga. Ct. App. 1997), the Georgia Court of Appeals held that where a guaranty omitted the name of the principal debtor and the name of the person individually guaranteeing the indebtedness, the guarantee was unenforceable because it did not comply with the requirements of the statute of frauds, and the omitted information could not be supplied by parol evidence. In so holding, the court relied on "an unbroken line of authority, [in which] this Court has consistently held that where a guaranty omits the name of the principal debtor, it is unenforceable as a matter of law," even when "the intent of the parties is manifestly

obvious." *Id.* at 570–71. More recently, in *LaFarge Building Materials, Inc. v. Pratt*, 706 S.E.2d 131, 132 (Ga. Ct. App. 2011), the court held that a guaranty that "failed to sufficiently identify the principal debtor . . . did not comply with the statute of frauds."

However, in *Schroeder v. Hunter Douglas, Inc.*, 324 S.E.2d 746, 748 (Ga. Ct. App. 1984), the Court of Appeals stated that:

> It is not necessary that the guaranty agreement contain in itself all of the requirements which the Statute of Frauds embraces. If the writing, therefore, refer[s] to any other writing which can be identified completely by this reference, without the aid of parol evidence, then the two or more writings may constitute a compliance with the statute.

(quoting *Turner v. Lorillard Co.*, 28 S.E. 383 (Ga. 1897); *see also Roach v. C.L. Wiggington Enters., Inc.*, 539 S.E.2d 543, 544 (Ga. Ct. App. 2000). Thus, when a writing specifically incorporates another writing, a court can read the two documents together when deciding whether a contract satisfies the statute of frauds. *See LaFarge*, 706 S.E.2d at 134 ("If a personal guaranty refers to any other writing which can be identified completely by this reference, without the aid of parol evidence, the guaranty can be construed together with the other writing to satisfy the statute of frauds.") (citations and internal quotation marks omitted); *Roach*, 539 S.E.2d at 545. In *Sysco*, 489 S.E.2d at 569–70, however, the Court of Appeals declined to read together two sections that appeared on the same paper but did not incorporate each other by reference or use the same terms. The court found that it would have to make inferences and consider impermissible parol evidence in order to determine the identity of the debtor. *Id.* Similarly, in *LaFarge*, 706 S.E.2d at 134, the same court refused to read a guaranty in conjunction with another document when the guaranty did not incorporate the other document by reference and the terms set forth in each document were unclear.

But Georgia law also appears to include a broader exception for contemporaneous writings generally, even if such writings do not explicitly incorporate each other. *See LaFarge*, 706 S.E.2d at 135 (analyzing the contemporaneous writings rule separately from the rule regarding whether documents incorporate each other). In *Baker v. Jellibeans, Inc.*, 314 S.E.2d 874, 877 (Ga. 1984), the Supreme Court of Georgia held that "as long as all the necessary terms are contained in signed contemporaneous writings, the statutory requirements and purpose of the Statute of Frauds have been met, whether or not the writings are cross-referenced." In order for the contemporaneous writings rule to apply, the writings relied on must be signed, and "the evidence must demonstrate that the writings were executed at the same time and in the course of the same transaction." *LaFarge*, 706 S.E.2d at 135 (internal quotation marks omitted).

Thus, in *C.L.D.F. v. Aramore LLC*, 659 S.E.2d 695, 696 (Ga. Ct. App. 2008), the Georgia Court of Appeals held that as a matter of contract law, it had to consider a lease and a guaranty agreement together as contemporaneous writings. The *C.L.D.F.* court cited *Duke v. KHD Deutz of America Corp.*, 471 S.E.2d 537, 538–39 (Ga. Ct. App. 1996), for the proposition that "[c]ontemporaneous written agreements are perhaps one of the surest ways to establish the intent of the parties in entering into each of those agreements." 659 S.E.2d at 696. The two documents in *C.L.D.F.* "were executed on the same date, at the same time, and at the same location," and the "Guaranty was physically attached to the Lease and was identified" as an exhibit and made a part of the Lease. *Id.* Similarly, in *Holcomb v. Norfolk Southern Railway Co.*, No. 1:09-CV-0891, 2010 WL 4510960, at *4 (N.D. Ga. Nov. 1, 2010), a federal district court in Georgia, citing *C.L.D.F.*, found that it could consider together two documents that were executed on the same date, at the same time, and at the same location.

Applying these principles, I find that the Lease Amendment is a contemporaneous writing that may be considered together with the Guaranty. Like the documents in *C.L.D.F.*, the Lease Amendment and the Guaranty were executed on the same date, at the same time, and at the same location, and the Guaranty was both physically attached to the Lease Amendment as an exhibit and referred to within the Lease Amendment. In addition, both documents are signed, as required by the contemporaneous writings rule. *See Baker*, 314 S.E.2d at 877; *LaFarge*, 706 S.E.2d at 135.[4]

Having found that the contemporaneous writings rule applies, permitting the Court to read the Guaranty in conjunction with the Lease Amendment, the question remains whether it is possible to fill in the essential terms of the Guaranty simply by reading these two documents together. As Mariner points out, the Lease Amendment and the Guaranty use different defined terms. The Lease Amendment uses the terms "Lessor" and Lessee" to refer to Elderberry and Living Centers, respectively. By contrast, the Guaranty uses the terms "Landlord," "Original Tenant," and "Tenant," but does not specifically state what parties are covered by those terms. Reading the two documents together and interpreting words according to their ordinary meaning, however, it is clear that the term "Lessor," which the Lease Agreement defines to mean Elderberry, refers to the same party that the term "Landlord" refers to in the Guaranty. Similarly, the term "Lessee," which the Guaranty defines to mean Living Centers, refers to the same party that the term "Original Tenant" refers to in the Guaranty. By reading the two documents together pursuant to the contemporaneous writings rule, I conclude that the Guaranty

---

[4] Mariner argues that under *LaFarge*, the contemporaneous writing rule does not apply in this case. The court in *LaFarge* did hold that a guaranty that referred to another writing but did not incorporate it by reference could not be read in conjunction with the other writing. 706 S.E.2d at 134–35. But the court analyzed the contemporaneous writing rule separately. *Id.* at 135. The court simply declined to apply that rule because the writing at issue was "unsigned, rendering the contemporaneous writing rule inapplicable." *Id.* Here, the Lease Agreement was signed and met the other requirements of the contemporaneous writings rule described in *C.L.D.F.*

does identify the creditor and the principal debtor, as required by the Georgia statute of frauds. I also conclude that the Guaranty's reference to "a certain Lease Agreement" sufficiently identifies the obligation Mariner agreed to guarantee, especially since that certain Lease Agreement was physically attached to the Guaranty. In sum, I hold that the Guaranty, read in conjunction with the Lease Amendment under the contemporaneous writings rule, contains all of the essential elements of a contract and is therefore valid under Georgia law. Accordingly, I will deny Mariner's motion for summary judgment.[5]

## B. Elderberry's Motion for Partial Summary Judgment

Elderberry has moved for summary judgment against the Continium Defendants on the basis that the undisputed material facts prove as a matter of law that each of them breached the terms of the Lease by failing to pay rent. Elderberry has also moved for summary judgment on Continium's counterclaim for unjust enrichment. For the following reasons, I will deny Elderberry's motion in its entirety.

### 1. Liability of FMSC and Continium

As a starting point, it is important to note that the Lease specifies that it is governed by Virginia law and that Virginia's statute of frauds requires that a contract for the lease of real estate for more than a year be in writing. *See* Va. Code § 11-2(6). Neither FMSC nor Continium signed either the Lease or the Lease Amendment. Elderberry argues that FMSC and Continium are nevertheless liable for breach of the Lease because Living Centers assigned the Lease to FMSC, and FMSC assigned the Lease in turn to Continium. FMSC and Continium

---

[5] I note that my finding that the Guaranty is valid does not mean that Mariner necessarily has any liability under it. As I discuss in detail below, I find there is a genuine issue of material fact as to whether the Lease was ever assigned by Living Centers to FMSC (and then in turn to Continium). If the facts presented at trial show that there was no assignment, then the Guaranty will not be obligate Mariner to pay the rent owed by Living Centers. The Guaranty states that Mariner guarantees the obligations of Living Centers's assignee, not of Living Centers itself. Thus, if facts presented at trial demonstrate that no assignment ever took place, then there is no obligation that Mariner has guaranteed for which it can be held liable.

have separately moved for summary judgment, arguing that the undisputed facts show that no assignments ever took place and that, as a matter of law, neither one of them is liable for breach of the Lease.  I will discuss each alleged assignment separately.

### a. Assignment of the Lease to FMSC

Although the Continium Defendants originally admitted that Living Centers assigned the Lease to FMSC, they have amended their Answer to deny that any assignment took place. Accordingly, the Court must examine the evidence presented by the parties to determine whether the undisputed facts show as a matter of law that Living Centers did or did not assign the Lease to FMSC.  Elderberry claims that a document entitled "Assignment and Assumption Agreement" (the "A&A Agreement") entered into by Living Centers and FMSC effected the assignment of the Lease.  The terms of the A&A Agreement, however, exclude the Lease from its coverage.[6] Section 2.1 of the A&A Agreement provides for the transfer of the nursing home business and the assets and personal property thereof, "as distinguished from the rights and obligations under the Applicable Lease," i.e., the Lease originally entered into by Elderberry and Living Centers. More importantly, section 2.2 explicitly provides that certain assets are not transferred under the A&A Agreement.  These assets, defined in the agreement as "Excluded Assets," include:

> all of the Assignor's [i.e., Living Centers's] real property and *all of the Assignor's real property leases and subleases and rights and interests therein* and all of Assignor's rights under any contract for the sale, assignment or assumption of any real property, lease, sublease or rights or interests therein; all leasehold improvements, ownership of which is retained by Assignor as sublessor and overtenant of any Sublease to Assignee; and all architectural plans and drawings and building plans and permits, provided, however, that Assignee shall obtain an assignment or sublease of Assignor's interest as tenant under the Applicable Lease pursuant to the Assignment of Lease or Sublease, as applicable.

---

[6] Because this is the case, I do not consider any issues raised by the fact that the A&A Agreement appears to have been made before Living Centers negotiated for and obtained the right to assign the Lease without Elderberry's permission.

(Emphasis added).  This language shows definitively that Living Centers did not assign the Lease to FMSC by means of the A&A Agreement.  Since the A&A Agreement does not effect an assignment of the Lease, and Elderberry has not produced any other document that definitively proves an assignment took place, I must deny Elderberry's motion for summary judgment against FMSC.

FMSC has moved for summary judgment in its favor on the basis that it was not a signatory to the Lease or Lease Amendment and that Elderberry has not produced any document that shows Living Centers assigned the Lease.  However, I find that Elderberry has produced sufficient evidence to establish a genuine issue of material fact as to whether an assignment did take place.  I base this conclusion on rather copious evidence that all parties believed that an assignment had taken place and acted in accordance with such belief.

First, the A&A Agreement, though it excludes the Lease from its coverage, expressly contemplates that an assignment would take place at some future time.  The second paragraph of the recitals states that "subsidiaries of FMSC are to become the lessees and licensed operators of the C Package MHC Nursing Homes [which includes the Elderberry facility] . . . pursuant to an assignment or sublease of the underlying third party lease."  Three paragraphs later, the A&A Agreement states that the underlying lease "will be assigned or subleased to Assignee pursuant to an assignment and assumption of lease."  In addition, section 2.2 of the A&A Agreement, which defines "Excluded Assets," states that "Assignee shall obtain an assignment or sublease of Assignor's interest as tenant under the Applicable Lease pursuant to the Assignment of Lease or Sublease, as applicable."

Next, Elderberry has produced an email dated January 18, 2007, from Boyd Gentry to Lynch Christian, in which Gentry wrote, "[a]s you know, effective with the First Amendment,

we have assigned the lease to Family Senior Care." In addition, in audited financial statements covering the year 2006 submitted to the Virginia Department of Medical Assistance Services ("VDMAS"), FMSC stated that it "leases its operating facility under a multi-year net operating lease with an unrelated party. The lease expires April 30, 2017. The lease offers two five year renewal options beyond this date." The financial statements elsewhere describe the facility as the Brian Center Health & Rehabilitation Center in Weber City, Virginia, and state that "[t]imely payment of all obligations under the lease is guaranteed by the parent company of the prior operator, Mariner Health Care, Inc." FMSC made similar statements to the VDMAS in audited financial statements covering the year 2008. Finally, Elderberry has produced a letter dated September 9, 2011, sent by The Bernstein Law Firm on behalf of FMSC, that also indicates that Living Centers had in fact assigned the Lease to FMSC. The first paragraph of the letter states:

> Our Firm represents Tenant FMSC of Weber City Operating, LLC. This letter is being sent in conjunction with Paragraph 4(4)(ii) of the Lease Agreement for of [sic] the Property notifying Elderberry of Weber City, LLC ("Landlord") of Tenant's intent of assignment and transfer of Tenant's rights under the Lease Agreement dated November 8, 2000 (the "Lease Agreement") to ContiniumCare of Weber City, LLC. ContiniumCare of Weber City, LLC is contracting to transfer substantially all of the assets of Tenant.

In sum, the A&A Agreement envisioned a future assignment of the Lease, Boyd Gentry told Elderberry that the Lease had been assigned, FMSC told the VDMAS in audited financial statements that it operated the Weber City nursing home facility pursuant to the Lease, and FMSC's own legal counsel told Elderberry that FMSC was the Tenant and intended to assign its rights as Tenant to another party, pursuant to the provisions of the Lease. This is evidence from which a finder of fact could reasonably conclude that a written assignment had taken place. Nevertheless, despite its prior representations to Elderberry and the Commonwealth of Virginia, FMSC now contends that no assignment ever occurred. In support of this contention, FMSC

submitted an affidavit from Alicia Dietrich, the Regional Vice President of Human Resources for Continium Health Care Management, LLC, who previously served in a similar capacity for FMSC. Dietrich stated in her affidavit that "[n]either FMSC nor Continium has any record of an assignment of the Lease from Living Centers to FMSC."

Having considered all of the evidence, I conclude that there exists a genuine issue of material fact regarding whether Living Centers assigned the Lease to FMSC. On the one hand, Elderberry has produced a significant amount of evidence indicating that an assignment took place. On the other hand, FMSC has presented evidence to the contrary, and indeed, Elderberry has not been able to produce any written assignment. Based on this record, I cannot say conclusively that either party is entitled to summary judgment on this issue.[7] For that reason, I must deny FMSC's motion for summary judgment as well as Elderberry's.

### b. Assignment of the Lease to Continium

Elderberry argues that FMSC assigned the Lease to Continium and that Continium is also liable for breach of the Lease. The parties do not dispute that FMSC's counsel sent a letter to Elderberry expressing FMSC's intention to assign the Lease to Continium. Continium simply argues that notwithstanding this representation of intent, no assignment ever took place.[8] According to Continium, FMSC only transferred the operations of the nursing home, not the Lease and the obligations arising under it.

In making this claim, Continium relies on a document entitled "Operations Transfer Agreement" (the "OTA") that it entered into with FMSC on October 31, 2011. Paragraph B of the OTA's recitals section states that the parties entered into the OTA "in conjunction with

---

[7] This is especially true since Elderberry had not yet had a chance to review a number of documents that were the subject of a motion to compel at the time of briefing and oral argument on the various summary judgment motions.

[8] Continium also argues now that no assignment could have taken place because Living Centers never assigned the Lease to FMSC in the first place.

[Continium's] receipt of an Assignment of the Facility's lease agreement (the "Lease Agreement") with the landlord, Elderberry of Weber City, LLC (the "Landlord") effective November 1, 2011." But the terms of the OTA do not by themselves assign the Lease. Section 2(A)(i) of the OTA states that FMSC agreed to transfer to Continium "[a]ll Assumed Contracts and Assumed Leases as such terms are defined in Section 13 of this Agreement." Section 13 does not define "Assumed Leases," but it does provide that Continium "shall accept, assume and discharge the contracts and leases set forth on Schedule 13, attached hereto and made part hereof." The same section defines "Assumed Contracts" to include all contracts and leases on Schedule 13 and any resident admission agreements covering any resident residing in the nursing home facility. Schedule 13, which bears the heading "Assumed Contracts," does not list any contracts. Thus, the "Assumed Contracts" that are assigned do not appear to include the Lease or the Lease Amendment. As a result, I conclude that the OTA does not prove that FMSC assigned the Lease to Continium.

But the OTA is not the only document addressing the transfer of the nursing home's operations. FMSC and Continium also entered into another agreement entitled "Assignment and Assumption of Contracts" (the "Assignment") that states that it is effective as of November 1, 2011, and is signed by representatives of both FMSC and Continium. The Assignment defines "Assignor" to mean FMSC and "Assignee" to mean Continium. The operative sections provide that, as part of the transfer of operations of the nursing home facility:

> Assignor hereby assigns, transfers and sets over to Assignee all of Assignor's right, title and interest in and to the following: . . . All service, supply, development, construction, maintenance *and other contracts or agreements*, including, without limitation, hospital transfer agreements, ambulance agreements, medical director agreements, and dietician agreements, whether written or oral, *relating to the Facility*, other than the Patient Care Contracts (collectively, the "Assumed Contracts").

(Emphasis added).  The language here is very broad, covering "all" contracts "relating to the Facility."  Although the paragraph defining "Assumed Contracts" lists examples of what types of contracts fall within the scope of the Assignment, it expressly states that it does so "without limitation."  I conclude that the Lease is a contract "relating to the Facility," and therefore the Assignment could serve as a writing that assigns the Lease to Continium.  Thus, I will deny Continium's motion for summary judgment.

I decline, however, to grant summary judgment in Elderberry's favor because it is not clear at this stage whether FMSC actually had the power to assign the Lease to Continium.  As discussed above, there are genuine issues of material fact regarding whether Living Centers assigned the Lease to FMSC.  If the evidence at trial proves that Living Centers did not assign the Lease to FMSC, then FMSC could not have legally assigned the Lease to Continium.  In that case, Continium would not be responsible for the payment of rent and other obligations imposed by the Lease.  Thus, determination of Continium's responsibility for the overdue rent must await the determination at trial of whether Living Centers assigned the Lease to FMSC in the first place.  Accordingly, I will deny Elderberry's motion for partial summary judgment on this issue.

## 2.  Liability of Living Centers

Elderberry has also moved for summary judgment against Living Centers, which signed both the Lease and the Lease Amendment.  Paragraph 7(1)(a) of the Lease provides that a "default in payment of any sum due [under the Lease] continuing seven (7) days after receipt of written notice of default by Lessee specifying the nature thereof" constitutes a breach of the Lease.  The Lease further provides that "in the event of assignment . . . [Living Centers] will remain secondarily liable for all of its obligations hereunder."  This provision comports with Virginia common law.  *See Jones v. Dokos Enters., Inc.*, 357 S.E.2d 203, 204–05 (Va. 1987).

The parties do not dispute that Living Centers did not pay any rent after March 2012, nor do they dispute that Elderberry satisfied the Lease's notice provisions regarding default. Nevertheless, Living Centers argues that summary judgment is inappropriate because: (1) Elderberry discharged any liability on the part of Living Centers (and the other Continium Defendants) by retaking the property; (2) the Lease was a contract for lease that precludes the recovery of future damages; and (3) there are genuine issues of material fact as to the affirmative defenses of impracticability and impossibility raised by Living Centers in its Answer. Although I find Living Centers's first two arguments are unavailing, I agree that there are genuine issues of material fact with respect to Living Centers's affirmative defenses, and I will therefore deny Elderberry's motion.

First, Living Centers argues that by retaking the property subject to the Lease, Elderberry released Living Centers from liability. However, Paragraph 7(3)(b) of the Lease specifies that:

> Upon an uncured Default by the Lessee, and notice from the Lessor, the Lessor may reenter and resume possession of the Property. . . . The Lessor's reentry shall not be deemed either an acceptance or a surrender of this Lease or a termination thereof. It is expressly understood and agreed that in the event of the reentry by the Lessor by reason of default of the Lessee, the Lessee shall nevertheless remain liable for the Rent and also for the taxes and insurance premiums payable by the Lessee as provided in this Lease, for the balance of the term herein originally demised.

The Lease Amendment does not change this provision. Although at common law, a landlord's re-entry terminated a lease and released the tenant from further liability on the lease, *see tenBraak v. Waffle Shops, Inc.*, 542 F.2d 919, 924 (4th Cir. 1976), nothing prevents parties from contracting around the common law rule to permit a landlord to re-enter the leased premises without discharging the tenant from liability under the lease. *See id.* at 925 (noting that the lease at issue in *tenBraak* contained a re-entry provision that modified the common law rules regarding

re-entry).  Accordingly, I conclude that Elderberry's re-entry on the property did not release Living Centers from the obligation to pay rent under the terms of the Lease.

Next, Living Centers argues that the Lease was a contract *for* lease as opposed to a contract *to* lease under Virginia law, and therefore Elderberry cannot recover future damages. Living Centers is correct that Virginia law distinguishes between contracts for lease and contracts to lease.  *See Boulevard Assocs. I, L.P. v. Wawa, Inc.*, 623 F. Supp. 2d 690, 692 (E.D. Va. 2009) (citing *tenBraak*, 542 F.2d at 924 n.3 (4th Cir. 1976)).  But this distinction simply goes towards what damages Elderberry can recover under Virginia law; it does not bear on the question of liability.  Thus, I conclude that this argument does not preclude summary judgment.

Finally, Living Centers argues that the Court should not grant summary judgment because there are material questions of fact related to the affirmative defenses of impossibility of performance and commercial impracticability.  Section 261 of the Restatement (Second) of Contracts describes the doctrine of impracticability as follows:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

After a lengthy discussion of the history of the doctrine, the Fourth Circuit held in *Opera Company of Boston, Inc. v. Wolf Trap Foundation for the Performing Arts*, 817 F.2d 1094, 1102 (4th Cir. 1987), that a party relying on the defense of impracticability "must establish (1) the unexpected occurrence of an intervening act, (2) such occurrence was of such a character that its non-occurrence was a basic assumption of the agreement of the parties, and (3) that occurrence made performance impracticable."

While the event that makes performance impracticable must be unexpected, "it does not necessarily have to have been unforeseeable." *Id.* at 1100. Moreover, the unexpected event need not make performance literally impossible; rather, performance is impracticable "when it can only be done at an excessive and unreasonable cost." *Transatlantic Fin. Corp. v. United States*, 363 F.2d 312, 315 (D.C. Cir. 1966); *see also* Restatement (Second) of Contracts § 261 cmt. d (1981) ("Performance may be impracticable because extreme and unreasonable difficulty, expense, injury, or loss to one of the parties will be involved."). But a "mere change in the degree of difficulty or expense" does not amount to impracticability, and a party is expected to use reasonable efforts to surmount obstacles to performance . . . and a performance is impracticable only if it is so in spite of such efforts." Restatement (Second) of Contracts § 261 cmt. d. In addition, if the obligor's actions cause the event that renders performance impracticable, the defense does not apply. *See id.*; *see also Appalachian Power Co. v. John Stewart Walker, Inc.*, 201 S.E.2d 758, 766–67 (Va. 1974); *Franconia Two, LP v. Omniguru Sys., Inc.*, 82 Va. Cir. 256, at *3 (Va. Cir. Ct. 2011).

Paragraph 4(8) of the Lease provides that the "Lessee or any person claiming under the Lessee, shall use the Property only for a skilled and intermediate and home for adults nursing facility [sic] of a proper, legal and first-class quality." Living Centers argues that by terminating the nursing home facility's Medicare and Medicaid certification, the VDHHS rendered it impracticable or impossible for Living Centers to operate the property in accordance with the requirements of paragraph 4(8). I conclude that Elderberry has not met its burden at the summary judgment stage because there exist genuine issues of material fact regarding Living Centers's affirmative defenses. It may be that performance was not impossible or impracticable after the VDHHS terminated the nursing home's Medicare and Medicaid certification, or it may

be that the loss of such certification was due to the actions of Living Centers. On this record, however, there is simply not enough information to decide that Living Centers's affirmative defenses fail as a matter of law. I will therefore deny Elderberry's motion for summary judgment against Living Centers.

### 3. Continium's Counterclaim

Finally, Elderberry has moved for summary judgment on Continium's counterclaim for unjust enrichment. Continium alleges that it is entitled to recover reasonable compensation for the value of certain assets it left behind at the Weber City nursing home facility. "Unjust enrichment is an equitable claim arising from the simple principle that 'one person may not enrich himself unjustly at the expense of another.'" *Odyssey Imaging, LLC v. Cardiology Assocs. of Johnston, LLC*, 752 F. Supp. 2d 721, 724 (W.D. Va. 2010) (quoting *Rinehart v. Pirkey*, 101 S.E. 353, 354 (Va. 1919)). To prevail on a theory of unjust enrichment, a claimant must show that he: (1) conferred a benefit on another party; (2) the other party knew that claimant was conferring the benefit; and (3) the other party accepted the benefit under circumstances that would render it inequitable to retain the benefit without paying for its value. *Odyssey*, 752 F. Supp. 2d at 724–25; *Nossen v. Hoy*, 750 F. Supp. 740, 745 (E.D. Va. 1990).

Elderberry argues that Continium cannot prove that it conferred a benefit upon Elderberry because Continium did not own the assets it left at the nursing home. In support of this argument, Elderberry points to two pieces of evidence: (1) an email dated October 24, 2012, in which Ted Duay, whose email signature indicates that he was writing on behalf of Continium, stated that the assets were owned by FMSC, not Continium; and (2) a Medicare Cost Report in which Continium stated that it had no fixed or movable equipment at the nursing home. Continium has put forth evidence of its own indicating that it did own the assets that are the

subject of the counterclaim. Section 2(A)(viii) of the OTA states that FMSC transferred to Continium "[a]ll other personal property currently used by Existing Operator at the Facility." Because of the conflicting evidence regarding ownership of the assets left at the nursing home, I find that I cannot grant summary judgment in favor of Elderberry on the basis that Continium did not own the assets.

Even if Continium did own the assets, Elderberry argues, the terms of the Lease preclude Continium from asserting a right to set-off for the value of the assets because Continium breached the Lease. Elderberry bases this argument on paragraph 7(3)(b) of the Lease, which provides that upon default by the Lessee, "[t]he Lessor, at the Lessor's option, may remove persons and property from the Property and may store the property in a public warehouse or elsewhere at the expense or for the account of the Lessee without liability for any damage on account of such removal." But this clause does not provide that the Lessee shall have no right to compensation or set-off for the value of the assets. Instead, it merely provides that Lessor may remove Lessee's property and store it "at the expense or *for the account* of the Lessee" without liability for damage to such property. This language at least implies that the Lessee does not forfeit ownership of the property. At most, it indicates that Lessee may be liable for the costs of off-site storage of its property and cannot recover for any damage to assets removed from the property. Even if the Lease did provide that the Lessee would have no right to set-off, I have found that there is a question of fact whether the Lease was ever assigned to Continium and thus whether the terms of the Lease apply to Continium at all. Accordingly, I will deny Elderberry's motion for summary judgment with respect to the counterclaim.

### IV. CONCLUSION

For the foregoing reasons, I will deny each of the pending summary judgment motions. An appropriate order accompanies this memorandum opinion.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this  24th  day of July, 2013.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE