# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| ELDERBERRY OF WEBER CITY, LLC, | CASE NO. 6:12-cv-00052 |
| *Plaintiff,* | |
| | MEMORANDUM OPINION |
| v. | |
| LIVING CENTERS – SOUTHEAST, INC., ET AL., | JUDGE NORMAN K. MOON |
| *Defendants.* | |

Plaintiff Elderberry of Weber City, LLC ("Elderberry") filed this action alleging one count of breach of a lease agreement against Living Centers – Southeast, Inc. ("Living Centers); FMSC Weber City Operating Company, LLC ("FMSC"); and ContiniumCare of Weber City, LLC ("Continium") (collectively, the "Continium Defendants"), and a separate count for breach of contract against Mariner Health Care, Inc. ("Mariner"). Mariner, Continium, and FMSC separately filed motions for summary judgment, and Elderberry filed a motion for partial summary judgment. In a memorandum opinion and order dated July 24, 2013, I denied all of the summary judgment motions because I found that a number of material facts remained in dispute.

A three-day bench trial took place on August 6–8, 2013. At trial, the parties contested three issues relating to their rights and obligations under a lease and lease amendment originally entered into by Elderberry and Living Centers: (1) whether Living Centers assigned the lease, as amended, to FMSC; (2) whether Continium could establish a counterclaim for unjust enrichment against Elderberry; and (3) what damages, if any, the parties were entitled to recover. As explained in the findings of fact and conclusions of law set forth below, I find that Living

Centers did in fact assign the lease to FMSC, Continium failed to prove its claim for unjust enrichment, and Elderberry is entitled to recover damages in the amount of $2,742,029.50 plus interest.[1]

## I. BACKGROUND

Prior to trial, the parties stipulated to the following facts.  On November 8, 2000, Elderberry Nursing Home, Inc. and Living Centers entered into a Lease Agreement (the "Lease") under which Living Centers agreed to operate  a long-term skilled nursing facility on a piece of property in Weber City, Virginia.  Elderberry acquired the property that was the subject of the Lease from Elderberry Nursing Home, Inc. on December 20, 2004.  At that time, Living Centers operated the nursing home on the property subject to the terms of the Lease.  During the leasehold, Elderberry and Living Centers negotiated for the expansion of the nursing home to a 90-bed facility.

In 2006, Elderberry and Continium agreed that the planned expansion would be funded by Elderberry, and the parties negotiated an amendment to the Lease (the "Lease Amendment") that extended the lease term for ten years and provided for two five-year extension options.  The Lease Amendment specifically stated that Elderberry acquired Elderberry Nursing Home, Inc.'s rights under the original Lease.  As part of the negotiations of the Lease Amendment, Living Centers requested the ability to assign the Lease and the Lease Amendment to Family Senior Care Holdings, LLC, or to any of that entity's subsidiaries or affiliates.  In exchange, Elderberry requested that Mariner, the parent company of Living Centers, execute a Lease Guaranty Agreement upon such assignment of the Lease.  The Lease Amendment indicates that C.L. Christian III signed it on June 26, 2006, on behalf of Elderberry, and Boyd P. Gentry signed it on

---

[1] In light of my previous rulings in this case, the findings of fact and conclusions of law set forth below mean that Continium is also liable for breach of the lease as an assignee, and Mariner is liable as guarantor.

July 5, 2006, in his capacity as Vice President of Living Centers. At the same time that Gentry signed the Lease Amendment, he also signed a document entitled "Lease Guaranty" (the "Guaranty"), which was attached to the Lease Amendment as Exhibit E. The signature block on the Guaranty indicates that Gentry signed that document in his capacity as Executive Vice President and Chief Financial Officer of Mariner.

FMSC began operating the nursing home facility in 2006, and improvements to the property funded by Elderberry were completed in April 2007. Pursuant to paragraph 5(1) of the Lease Amendment, the ten-year term of the Lease was scheduled to reset and begin on "the first day of the calendar month following the Completion of Construction," which was May 1, 2007.

On September 9, 2011, counsel for FMSC sent a letter to Elderberry stating that FMSC, which had been operating the Weber City nursing home since 2006, intended to assign the Lease to Continium. Continium began paying rent to Elderberry in November 2011, and continued to pay rent monthly as due under the terms of the Lease and the Lease Amendment until March 2012. Neither Continium nor any other defendant has paid rent since. On April 16, 2012, Elderberry sent written notice to Ted Duay of Family Senior Care that the rent payment due on April 1, 2012, was past due. On July 19, 2012, Elderberry received notification that the Virginia Department of Health & Human Services, Centers for Medicare & Medicaid Services ("VDHHS") was terminating Continium's Medicare Provider Agreement as a result of certain failures of Continium to operate the facility in conformance with VDHHS regulations, and on account of other deficiencies. Continium ceased all operations in the facility in August 2012.

Elderberry sent a letter to Living Centers, Continium, Mariner, and the Bernstein Law Firm on August 15, 2012, demanding payment of past-due rent and notifying all parties that if Elderberry did not receive payment within seven days of the notice, Elderberry would terminate

the Lease and pursue remedies in court if necessary.  On August 24, 2012, Elderberry sent

another letter terminating the lease to the same four recipients.

## II. DISCUSSION

Federal Rule of Civil Procedure 52(a)(1) provides that "[i]n an action tried on the facts

without a jury . . . the court must find the facts specially and state its conclusions of law

separately.  The findings and conclusions may be stated on the record after the close of the

evidence or may appear in an opinion or a memorandum of decision filed by the court."

### A.  Findings of Fact

In addition to the facts stipulated to by the parties and described above, I make the

following findings of fact.

### 1.  Lease Amendment Negotiations

1.  Negotiations regarding the expansion of the Weber City nursing home facility (the

    "Facility") took place in 2006 between Lynch Christian ("Christian"), the manager of

    Elderberry, and Boyd Gentry ("Gentry").

2.  At the time Christian and Gentry were negotiating the Lease Amendment, Gentry was

    a Vice President of Living Centers and Executive Vice President and Chief Financial

    Officer of Mariner.

3.  In the spring of 2006, Gentry came to Roanoke, Virginia, to meet with Christian and

    representatives of Smith/Packett Med-Com, LLC ("Smith/Packett").

4.  At the meeting in Roanoke, Gentry and Christian discussed the renovation of the

    Facility and conducted negotiations regarding the terms of the Lease Amendment,

    including provisions addressing assignment of the Lease and a guaranty by Mariner.

5. Christian testified at trial that having the guaranty provision in the Lease Amendment was important to him in negotiating with Gentry.

6. During his trip to Virginia to conduct negotiations with Christian, Gentry also went to Weber City to tour the Facility and to understand what work would be done during the renovation and expansion.

## 2. Assignment of the Lease from Living Centers to FMSC

7. At trial, Elderberry entered into evidence a document entitled "Assignment and Assumption Agreement," which is undated but indicates that it was prepared in 2005.

8. The Assignment and Assumption Agreement states that it is made by and between Living Centers as assignor and FMSC as assignee.

9. Section 2.1 of the Assignment and Assumption Agreement states that Living Centers "does hereby assign and transfer" to FMSC, "the nursing home and health care business" conducted at the Facility.

10. The second paragraph of the recitals section contained in the Assignment and Assumption Agreement states that "subsidiaries of FMSC are to become the lessees and licensed operators of the C Package MHC Nursing Homes [which includes the Facility] . . . pursuant to an assignment or sublease of the underlying third party lease."

11. The Assignment and Assumption Agreement also states that the underlying lease "will be assigned or subleased to Assignee pursuant to an assignment and assumption of lease," and section 2.2 of the Assignment and Assumption Agreement, which defines "Excluded Assets," states that "Assignee shall obtain an assignment or

sublease of Assignor's interest as tenant under the Applicable Lease pursuant to the Assignment of Lease or Sublease, as applicable."

12. Based on the provisions of the Assignment and Assumption Agreement, I find that Living Centers intended not only to transfer the operations of the Facility to FMSC, but also to assign the Lease to FMSC.

13. Although Defendants presented evidence that most of the facility transfers contemplated by Family Senior Care in 2005 did not take place, Defendants did not present any specific, credible evidence that showed that the transfer of the Facility did not take place.

14. In fact, as envisioned in the Assignment and Assumption Agreement, the operations transfer did take place, and Defendants admit that FMSC began operating the Facility in 2006.

15. FMSC paid the monthly rent due under the Lease to Elderberry from the time FMSC began operating the Facility through October 2011, after which Continium began operating the Facility and paying rent.

16. On July 5, 2007, Gentry's assistant emailed a copy of the signed Lease Amendment and Guaranty to Christian, who then authorized Martin Brothers Construction to proceed with construction on the Facility.

17. In an email dated January 18, 2007, Gentry wrote to Christian, "As you know, effective with the First Amendment, we have assigned the lease to Family Senior Care. In this regard your contacts are Avi Klein and Greg Forsey. They are copied

on this email and I ask each of them to contact you and provide their respective telephone contact information."[2]

18. In an email dated February 25, 2007, Christian responded to Gentry's email and requested a signed copy of the assignment, but he received no response.

19. Christian testified that in the summer of 2007, when the renovations to the Facility were completed, Avi Klein ("Klein"), Ted Duay ("Duay"), and Greg Forsey ("Forsey") made oral representations that Family Senior Care was the tenant of the Facility. Defendants did not present any evidence that contradicts Christian's testimony regarding the oral representations of Klein, Duay, and Forsey.

20. As the operator of the Weber City nursing home, FMSC submitted to the Virginia Department of Health on October 23, 2008, an "Application for Nursing Home License" (the "Application") containing certain information required by Virginia law to be disclosed to the Virginia Department of Health.

21. The Application states that the Facility's operator/manager, FMSC, has a lease or management agreement with Elderberry.

22. A representative of FMSC signed the Application and certified that the information contained therein was accurate and true.

23. In a letter sent to Elderberry dated September 9, 2011 (the "Bernstein Letter"), attorney Michael I. Bernstein wrote: "Our Firm represents Tenant FMSC of Weber

---

[2] Although Gentry did not explicitly testify at trial that Living Centers did not assign the Lease to FMSC, he suggested that his email dated January 18, 2007, was meant to refer only to a transfer of operations. Yet the email itself does not contain the word "operations" or any other plausible basis for interpreting it in the way Gentry suggested. In his testimony on this subject and others, especially his visit to Roanoke and the Facility to negotiate the Lease Amendment, Gentry exhibited an evasiveness and unwillingness to concede even the most obvious facts. For example, Gentry's testimony at trial regarding his visit to Virginia and the negotiations he conducted with Christian in Virginia directly contradicted previous statements Gentry made to the Court in a sworn affidavit. Based on his evasions and contradictions, I find that Gentry's trial testimony was not credible. I also note that although he is no longer employed by Mariner, Gentry receives $10,000 per month as a consultant for Mariner.

City Operating, LLC.  This letter is being sent in conjunction with Paragraph 4(4)(ii) of the Lease Agreement for of [sic] the Property notifying Elderberry of Weber City, LLC ("Landlord") of Tenant's intent of assignment and transfer of Tenant's rights under the Lease Agreement dated November 8, 2000 (the "Lease Agreement") to ContiniumCare of Weber City, LLC."

24. The Bernstein Letter indicates that Living Centers had assigned the Lease to FMSC because the letter stated that FMSC intended to assign its rights under the Lease to Continium.

25. On August 31, 2012, in the United States District Court for the Northern District of Georgia, Mariner filed a complaint for declaratory relief in which Mariner alleged: "In fact, the Lease was either assigned or subleased to FMSC Weber City Operating Company, LLC ("FMSC Operating"), a subsidiary of [sic] affiliate of Family Senior Care Holdings LLC."

26. At trial, Elderberry entered into evidence a document entitled "Assignment and Assumption of Lease."

27. Defendants stipulated that the Assignment and Assumption of Lease, which states that it is made between Living Centers as assignor and FMSC as assignee, bears the authentic signatures of Harry Grunstein, President of Living Centers, and Avi Klein, Manager of FMSC.

28. The Assignment and Assumption of Lease lists FMSC's address as 105 Clonce Street, Weber City, VA, 24251, which is the address of the Facility.

29. The Assignment and Assumption of Lease states that the lease and premises to be assigned are identified on Schedule A, which lists the Facility's address and identifies the landlord as "Elderberry Nursery Home, Inc."

30. The Assignment and Assumption of Lease provides that "Assignor [i.e., Living Centers] wishes to assign all its right, title and interest in and to and obligations under said Lease to Assignee [i.e., FMSC], and Assignee wishes to assume all of Assignor's right, title, and interest in and to and obligations under said Lease, all in accordance with the terms of the Lease."

31. Having considered all of the evidence, I find that Living Centers did in fact assign the Lease to FMSC. I base this conclusion on the facts set forth in paragraphs 7–30, which show that (i) Living Centers intended to assign the Lease to FMSC as part of a transfer of the operations of the Facility, which Defendants admit took place; (ii) FMSC paid rent as due under the Lease to Elderberry until October 2011, conduct that strongly indicates FMSC had assumed the lessee's obligations under the Lease; (iii) FMSC employees, officers, or agents made both oral and written representations to Elderberry that an assignment had taken place; (iv) FMSC represented to the Virginia Department of Health that it had a lease with Elderberry; (v) Mariner represented to another federal district court that an assignment or sublease had taken place; and (vi) there is a signed writing that contains the essential terms of an assignment of the Facility.[3]

---

[3] Although I find as a matter of fact that Living Centers assigned the Lease to FMSC, there remains the legal question whether that assignment satisfied the requirements of Virginia law, specifically, those imposed by the statute of frauds. I discuss that legal issue below.

### 3. Continium's Counterclaim

32. Pursuant to the terms of the Lease and the Lease Amendment, Elderberry originally provided the furnishings and equipment in the Facility, including the furnishings and equipment in the new addition that was completed in 2007.

33. Allison Stone, writing on behalf of Klein, emailed Christian on March 30, 2007, to inform him that FMSC would not pay the rental increase set forth in the Lease Amendment until furniture purchased by Elderberry was delivered to the Facility.

34. In an email dated October 24, 2012, from Ted Duay of Continium to Sam Phillips of Walker-Phillips, an accounting firm that focuses on providing Medicare and Medicaid reimbursement services to nursing facilities, Duay wrote that Continium "did NOT acquire the fixed assets of the predecessor, FMSC Weber City Operating Company. These assets stayed with the old entity and inure to the benefit of the landlord."

35. Continium did not introduce evidence at trial, either through witness testimony or written exhibits, that contradicted or otherwise modified or explained Duay's representation to Walker-Phillips.

36. On August 13, 2012, Alicia Dietrich ("Dietrich"), who served as the regional director for HR in operations for Continium, walked through the Facility room-by-room, to take an inventory of equipment and furniture then in the Facility.

37. Based on her survey of the building, Dietrich prepared a list of all the equipment then in the Facility.

38. At trial, Dietrich testified that not every item on the list entered into evidence as Defendants' Exhibit 17 was actually left at the Facility.

39. Most significantly, an automobile valued on Exhibit 17 at $30,000, was removed from the Facility.

40. According to her deposition testimony and the list Dietrich prepared, the value of all of the equipment on the list was $406,030.00

41. In her trial testimony, Dietrich testified that that the equipment on the list was only worth between $150,000 and $200,000, contradicting her earlier deposition testimony and her calculation on Exhibit 17.[4]

42. Bob Pereira ("Pereira"), who served as maintenance supervisor at the Facility in August 2012 and looked after the Facility until it was occupied by a new tenant, testified that Elderberry or the new tenant disposed of all equipment or furniture that was in the Facility in August 2012 except for: fifteen folding chairs, two televisions, one chart rack, one shower gurney, one microwave, five insulated food carts, 28 filing cabinets, four lifts, two linen cars, five bookshelves, six folding tables, a convection stove, and wheelchairs.

43. Pereira testified that a lot of the furniture and other property left at the Facility was in "sad shape" and that it looked unusable to him.

44. Pereira also testified that personnel working for the new tenant stated that they "couldn't do anything" with the equipment that was left in the Facility.

45. Andrew Chester ("Chester"), who worked for Smith/Packett as a Development Coordinator during the summer of 2012, testified that when he visited the Facility in July 2012, most of the furnishings were in poor condition.

---

[4] Like Gentry, Dietrich contradicted previous statements or tried to avoid the obvious implications of her deposition testimony in ways that seriously undermined her credibility.

### 4.  Damages

46. None of the Defendants paid rent to Elderberry after March 2012.

47. Christian received a call from Charlie Menten ("Menten") in mid-April 2012, during which Menten, who performed work for Continium and FMSC, informed Christian that Continium or one of its related companies was having financial difficulties. Menten asked if Elderberry could make some concessions on the rent for the Facility.

48. Elderberry responded to Menten's request by a letter dated April 24, 2012, addressed to Avi Klein, President of Family Senior Care Holdings, LLC (the "Forbearance Letter"), in which Elderberry offered concessions including a temporary reduction in rent.

49. In May 2012, Continium or its agents represented to Christian that it was not going to agree to the terms outlined in the Forbearance Letter, and Christian began to look for a new tenant for the Facility.

50. Christian himself independently contacted potential tenants for the Facility.

51. Elderberry ultimately hired Smith/Packett to find a new tenant for the Facility, negotiate a lease, and provide certain asset management services related to the operation of the Facility under the new lease.

52. The terms of Elderberry's agreement with Smith/Packett are set forth in an Asset Management Agreement dated August 8, 2012.

53. Elderberry and Smith/Packett negotiated the Asset Management Agreement at arm's length, and Elderberry secured the best terms it could under the circumstances.

54. The Asset Management Agreement provided that Smith/Packett would be compensated in three ways: (1) Smith/Packett would receive a $150,000 signing fee

once a new lease was signed; (2) Smith/Packett would receive a $350,000 value fee on June 1, 2015, unless the new tenant was in default or the terms of a new lease differed materially from the terms set out in Exhibit B to the Asset Management Agreement; and (3) Smith/Packett would receive a management fee equal to ten percent of the rent payable under a new lease.

55. Each of these fees was an integral part of the Asset Management Agreement, and the fee structure was negotiated as an overall package.

56. Elderberry could not have reached an agreement with Smith/Packett without accepting the fee structure ultimately agreed upon.

57. When it hired Smith/Packett, Elderberry's objective was to secure a tenant by the end of 2012, because without a tenant at the end of the year, it would have been difficult if not impossible to obtain a license from the Virginia Department of Health to operate the Facility.

58. Without a license at the end of the year, Elderberry or its tenant would not have been able to renew or transfer the existing license, and Elderberry or its tenant would have had to begin the licensing process from scratch.

59. Elderberry and Smith/Packett asked Virginia regulators if they could waive the requirement that the Facility be occupied at the end of the year, but the regulators refused to waive that requirement.

60. In 2010, as a result of deficiencies uncovered during inspections by the Virginia Department of Health, the Facility became a "Special Focus Facility," which meant that it was subject to more frequent health and safety inspections.

61. The Facility remained a Special Focus Facility through August 2012, when Continium discharged the residents, shut down operations, and abandoned the Facility.

62. The Facility's status as a Special Focus Facility made it more difficult to find a new tenant after Continium left.

63. On more than one occasion leading up to August 2012, the Facility had problems with vendors not being paid. On at least two occasions, a power company representative came to the Facility with shut-off notices; propane gas service was interrupted due to lack of payment; and phone services were interrupted "several times," according to Pereira, whose testimony was not contradicted by any evidence offered by the Defendants.

64. In his capacity as a Development Coordinator working on the Elderberry account for Smith/Packett, Chester testified that for a ten-month period from July 2012 through May 2013, he spent about 20% of his time, or one day per week, working on issues relating to the Facility, and that he visited the Facility in July 2012.

65. According to Chester, from a regulatory standpoint, the Facility needed a significant amount of repair, and it was very evident that the tenant had not put money into the Facility, which was not well maintained.

66. With the assistance of Smith/Packett and pursuant to the terms of the Asset Management Agreement, Elderberry reached an agreement to lease the Facility to Nova Healthcare Group, LLC ("Nova").

67. When Continium left the Facility in August 2012, the Facility required a significant amount of work in order to bring it up to a licensable condition.

68. Most critically, the Facility required architectural and construction work to meet fire code safety standards.

69. The lease between Elderberry and Nova, as amended (the "Nova Lease"), was for a ten-year term beginning on January 1, 2013, but the parties agreed that Nova would not begin paying rent until March 2013.

70. As part of the Nova Lease negotiations, Nova required a total renovation budget and working capital in the amount of $1.250 million, which amount was factored into the setting of the rent under the Nova Lease.

71. Given the time constraints related to licensing, the condition of the Facility, and its status as a Special Focus Facility, I find that Elderberry acted reasonably both in hiring Smith/Packett and in agreeing to the terms of the Nova Lease.

72. Nova began paying rent under the Nova Lease in March 2013.

73. Elderberry paid the utilities, taxes, and insurance for the Facility during the period from September 2012 through February 2013.

74. In that time period, Elderberry paid electric bills totaling $27,840.21, propane gas bills totaling $3,361.32, trash bills totaling $7,740.91, water bills totaling $2,215.41, phone bills totaling $382.72, sprinkler inspection bills totaling $450, real estate taxes totaling $66,119.93, and insurance premiums totaling $28,340.86, The total of these utilities, taxes, and insurance fees is $136,451.36.

75. During that same time period, Elderberry paid property management and maintenance fees totaling $18,525.06 to Bob Pereira for work to maintain and keep secure the Facility and its premises.

76. Elderberry paid $166,183 to Integrated Construction and Jones & Jones Architects for architectural and construction services required to bring the Facility into compliance with the fire code.

77. Elderberry paid $588,708.60 to pay for renovations and new furniture that was required by Nova as a condition of the Nova Lease.

78. Elderberry paid $661,291.40 in working capital that was required by Nova as a condition of the Nova Lease.

79. The difference in rent between what Continium was required to pay under the Lease and what Nova actually did pay under the Nova Lease for the period from March 2013 through August 2013 was $36,105.97.

80. The difference in rent between what Continium was required to pay under the Lease and what Nova is required to pay under the Nova Lease for the period from September 2013 through April 2017, when the Lease term was scheduled to end, is $89,751.07.

81. At trial, Defendants proffered their witness Scott Hillegass ("Hillegass") as an expert qualified to offer opinions regarding fees charged by brokers who market nursing home facilities in the United States, occupancy rates for nursing homes, and how to assess and calculate the value of a lease.

82. Hillegass testified that the standard fee charged by brokers for securing leases of long-term care facilities is between three and six percent.

83. Hillegass did not offer any opinion regarding the fee Elderberry paid to Smith/Packett other than to state his opinion regarding the standard fee charged by brokers.

84. I find that the services provided by Smith/Packett went well beyond those provided by an ordinary broker.

85. Hillegass never visited the Facility, he testified that he has never evaluated for purchase or lease a facility that has had its Medicare and Medicaid funding cut off, his company does not operate any nursing homes in Virginia, and he had apparently reviewed the Facility's lease documentation and other records only days before testifying; nevertheless, Hillegass testified about the conclusions he would draw from the Facility's occupancy rate.

86. I find that Hillegass lacked an adequate factual foundation to draw any conclusions about the state of the Facility at the time Continium abandoned it.

87. Using a demonstrative aid that was not entered into evidence, Hillegass testified that the working capital that Nova demanded Elderberry provide under the Nova Lease would eventually be recovered in the form of increased rent.

88. Hillegass did not offer any evaluation of or opinion regarding the total amount of damages that Elderberry ought to recover.

**B. Conclusions of Law**

<u>1. Legal Issues Decided Prior to Trial</u>

In the July 24 memorandum opinion addressing the parties' various summary judgment motions, I decided a number of legal issues relating to Elderberry's claims. With respect to Elderberry's breach of contract claim against Mariner, I held that Georgia law applied in determining whether the Guaranty was a valid contract. *See Elderberry of Weber City, LLC v. Living Centers – Southeast, Inc.*, No. 6:12-cv-00052, 2013 WL 3830501, at *3 (W.D. Va. July 24, 2013). Applying Georgia law, I concluded that the Guaranty, read in conjunction with the

- 17 -

Lease Amendment under Georgia's contemporaneous writings rule, contained all of the essential elements of a contract and is therefore valid and enforceable. *Id.* at *5. With respect to Elderberry's breach of lease claim against the Continium Defendants, I found that the Lease and Lease Amendment were governed by Virginia law. *Id.* Since neither FMSC nor Continium signed the Lease or the Lease Amendment, the liability of those two parties depends on whether the Lease was assigned by Living Centers to FMSC and then by FMSC to Continium. I found that there were disputes of material fact regarding whether the first assignment (from Living Centers to FMSC) took place. *Id.* at *9. But I also decided that if Elderberry could prove at trial that the first assignment had in fact taken place, then as a matter of law, FMSC assigned the Lease to Continium via an agreement entitled "Assignment and Assumption of Contracts." *Id.* at *8. Finally, relying on the express terms of the Lease, I also decided that Elderberry's retaking of the property did not release Living Centers from liability for any breach of the Lease. *Id.* at *10.[5]

## 2. Legal Issues Resolved by the Trial

### a. Assignment of the Lease from Living Centers to FMSC

Having decided the factual issue that Living Centers assigned the Lease to FMSC, I must now decide the legal issue of whether that assignment satisfied the statute of frauds. Virginia's statute of frauds provides that "[u]nless a promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, is in writing and signed by the party to be charged or his agent, no action shall be brought . . . upon any contract for the sale of real estate, or for the lease thereof for more than a year." Va. Code § 11-2. The parties do not

---

[5] I declined to grant summary judgment against Living Centers because that entity had argued that there were material questions of fact related to affirmative defenses of impossibility of performance and commercial impracticability. *Elderberry*, 2013 WL 3830501, at *10. However, Defendants presented no evidence at trial that would support the affirmative defenses of impossibility or impracticability, and in their post-trial brief, Defendants abandoned any argument regarding affirmative defenses and admitted that Living Centers is bound by the Lease.

dispute that the Lease and Lease Amendment both fall within the coverage of the statute and satisfy its requirements. Defendants argue, and I agree, that any assignment of the Lease must also satisfy the statute of frauds. But unlike Defendants, I conclude that the assignment of the Lease from Living Centers to FMSC did satisfy the requirements of Virginia's statute of frauds, and the assignment was therefore lawful and valid.

In analyzing this issue, it is important to explain the purposes of the statute of frauds and to clarify what it requires. The purpose of the statute of frauds is to "provide reliable evidence of the existence and terms of certain types of contracts and to reduce the likelihood that contracts within the scope of this statute can be created or altered by acts of perjury or fraud." *Lindsay*, 531 S.E.2d at 575; *see also Reynolds v. Dixon*, 46 S.E.2d 6, 8 (Va. 1948). "The object of the statute of frauds is to prevent frauds and perjuries, and not to perpetrate them, so that the statute is not enforced when to do so would cause a fraud and a wrong to be perpetrated." *T... v. T...*, 224 S.E.2d 148, 151 (Va. 1976); *see also C. Porter Vaughan, Inc. v. DiLorenzo*, 689 S.E.2d 656, 660 (Va. 2010).

Significantly, the statute of frauds "does not require that contracts within its purview be written. It merely interposes a bar to the enforcement of certain oral contracts, which bar may be removed by proof of a *sufficient written memorandum* of the transaction." *Drake v. Livesay*, 341 S.E.2d 186, 188 (Va. 1986) (emphasis added); *see also DiLorenzo*, 689 S.E.2d at 660. Indeed, the statute requires only that "a promise, contract, agreement, representation, assurance, or ratification, *or some memorandum or note thereof*" be in a writing "signed by the party to be charged or his agent." Va. Code § 11-2 (emphasis added). When the bar to enforcement is removed, "it is the oral contract which is subject to enforcement, not the memorandum," and "the validity of the oral contract may be established by other evidence." *Drake*, 341 S.E.2d at 188.

Virginia law does not require Elderberry to produce the actual assignment contract itself; "some memorandum or note thereof" is sufficient. Va. Code § 11-2. Thus, Elderberry need only prove the existence of a written memorandum containing the essential terms of the assignment contract. As I discussed in the findings of fact section above, copious evidence—nearly all of it consisting of the actions, statements, or writings of FMSC or its agents—conclusively shows that Living Centers assigned the Lease to FMSC. Furthermore, there is a written instrument, the Assignment and Assumption of Lease, that appears to effect the exact assignment that FMSC's employees and agents repeatedly said had taken place. But even if the Assignment and Assumption of Lease that was entered into evidence is not the actual agreement that effected the assignment of the Lease from Living Centers to FMSC, it is nevertheless a signed memorandum that furnishes written proof of a transaction that was definitively proven by other evidence.[6] *See Drake*, 341 S.E.2d at 188. Accordingly, I conclude not only that Living Centers in fact assigned the Lease to FMSC, but also that such assignment satisfied Virginia's statute of frauds because there was a written memorandum of the transaction signed by the party to be charged.

Even if the Assignment and Assumption of Lease or some other writing did not satisfy Virginia's statute of frauds, I find that under Virginia law the statute of frauds should not be enforced in this case because to enforce the statute would cause a fraud and a wrong to be perpetrated. Elderberry is not trying to create a contract where none existed or to alter the terms of a contract, which is what the statute of frauds is intended to prevent. Instead, FMSC asks the Court to find that no contract existed despite repeated and definitive representations to the contrary that were made to Elderberry, to the Commonwealth of Virginia, and to the federal

---

[6] For that reason, it does not matter that there is also a Sublease Agreement that was also signed by Grunstein and Klein. The statute of frauds only requires a signed writing that provides evidence of an agreement that can be proven by other means. Elderberry has proven that an assignment took place and has presented a document that reflects that proof. There is no evidence that what took place was a sublease.

courts. The evidence presented at trial shows that Gentry, Klein, Duay, and Forsey each told Elderberry, either verbally or in writing, that an assignment took place. Counsel for FMSC represented that FMSC was the tenant of the Facility and that the company intended to transfer the Lease to Continium. In completing an application form required by Virginia law regulating nursing homes, FMSC told the Virginia Department of Health that it was the tenant at the Facility, and a representative of the company signed a certification that the information provided was accurate and true. In its complaint for declaratory judgment, Mariner told the United States District Court for the Northern District of Georgia that an assignment took place.

By arguing now that no assignment ever took place and that no writing exists that provides proof of such an assignment, Defendants are effectively telling the Court that all of their earlier representations were not true, meaning that one or more Defendants made false statements not only to Elderberry, but also to the Virginia Department of Health and to a federal district court. I conclude that enforcing the statute of frauds under such circumstances would amount to perpetrating a fraud. Therefore, even if I did not also conclude that the statute of frauds was satisfied in this case, I find that under Virginia law, the statute of frauds cannot and should not be enforced.

### b. Continium's Counterclaim

Continium brought a counterclaim alleging that it is entitled to recover reasonable compensation for the value of certain furniture and equipment left at the Facility. "Unjust enrichment is an equitable claim arising from the simple principle that 'one person may not enrich himself unjustly at the expense of another.'" *Odyssey Imaging, LLC v. Cardiology Assocs. of Johnston, LLC*, 752 F. Supp. 2d 721, 724 (W.D. Va. 2010) (quoting *Rinehart v. Pirkey*, 101 S.E. 353, 354 (Va. 1919)). To prevail on a theory of unjust enrichment, a claimant

must prove that it: (1) conferred a benefit on another party; (2) the other party knew that claimant was conferring the benefit; and (3) the other party accepted the benefit under circumstances that would render it inequitable to retain the benefit without paying for its value. *Odyssey*, 752 F. Supp. 2d at 724–25; *Nossen v. Hoy*, 750 F. Supp. 740, 745 (E.D. Va. 1990).

Having considered the witness testimony and exhibits entered into evidence at trial, I conclude that Continium failed to prove that it conferred a benefit on Elderberry. There is no doubt that furniture and other equipment remained in the Facility when Continium abandoned it in August 2012. Dietrich, who served as the regional director for HR in operations for Continium, testified that she created an inventory of items remaining in the Facility on or about August 13, 2012, and Bob Pereira confirmed that the vast majority of the items on Dietrich's list—though not all—remained in the Facility. Continium argues that it should recover the value of everything that appears on the list created by Dietrich. However, the list itself contains no indication of when the furniture or equipment was purchased, what entity purchased it, or what condition it was in.[7] For that information, Continium relies on invoices, a document entitled "Accounts Payable Aged Invoice Report," and pictures taken by Dietrich when walked through the Facility in August 2012.

For Continium to have conferred a benefit upon Elderberry, it must have left behind assets that it owned or purchased and that retained some type of value. I conclude that Continium has not proven that it owned any equipment purchased prior to October 2011, when Continium began operating the Facility. In an email from Ted Duay of Continium to Sam

---

[7] In addition, the inventory lists the value of the furniture as $406,030, which is the amount Continium stated its counterclaim that it sought to recover. Dietrich also testified in her deposition that the furniture was worth $406,030. But Dietrich contradicted that statement at trial, where she testified that she could not assign a specific value to the equipment, but that it was worth only $150,000–200,000 due to depreciation. As a result, I find that the value of the equipment that was left behind was worth $200,000 at most.

Phillips of Walker-Phillips, Duay wrote that Continium "did NOT acquire the fixed assets of the predecessor, FMSC Weber City Operating Company. These assets stayed with the old entity and inure to the benefit of the landlord." (Emphasis in the original). Continium did not present any evidence at trial that contradicts this statement or that shows that Continium did acquire FMSC's assets. Thus, Continium cannot claim compensation for any assets left at the Facility which were acquired before Continium took over operations in October 2011 because the evidence presented at trial does not prove that Continium owned or purchased any of those assets.[8]

Moreover, even if Continium had proved that it acquired FMSC's assets, Continium did not meet its burden to prove that the assets left behind belonged to Continium or its predecessors such that leaving the assets behind conferred a benefit on Elderberry. The parties do not dispute that Elderberry originally furnished the Facility, including the new addition that was completed in 2007, pursuant to the terms of the Lease and the Lease Amendment.[9] And paragraph 4(2) of the Lease required the lessee to maintain the Facility, any improvements, and all personal property at the Facility in good repair subject to reasonable wear and tear. Thus, replacement of property originally furnished by Elderberry fell within the lessee's obligations under the Lease. So if the lessee had to purchase a new mattress to replace an older mattress originally provided by Elderberry, the lessee does not confer a benefit on Elderberry by leaving that mattress behind. Rather, by purchasing replacement furniture, the lessee merely fulfills its obligations to maintain

---

[8] Just four of the invoices entered into evidence reflect purchases of furniture or equipment made after Continium took over the Facility. The only items listed on those invoices that also remained at the Facility in August 2012, according to the inventory taken by Dietrich, were nine televisions and two mattresses. Based on the invoices, the nine televisions cost $4,381.92 when new, excluding taxes and freight, and the mattresses cost $870, excluding taxes and freight. However, as I discuss in more detail below, I find that Continium has not proven that this equipment, or any of the other equipment, was a benefit conferred on Elderberry by Continium.

[9] In fact, a representative of FMSC stated in an email to Christian that the provision of furniture in the new addition by Elderberry was required by the terms of the Lease. In that same email, the FMSC representative stated that FMSC would not pay the rent increase set forth in the Lease Amendment until such furniture was delivered.

the Facility and the property therein in good working condition, and leaves Elderberry in the same position it was in at the beginning of the lease term.

This is important because Continium failed to present evidence at trial that proves what equipment was simply purchased to replace equipment originally provided by Elderberry, and what equipment, if any, was purchased for other reasons and on its own account. Indeed, Dietrich, who was the only defense witness to testify regarding the furniture and equipment left at the Facility, specifically stated that the inventory she prepared did not distinguish between these two categories, and that her inventory included all furniture left in the Facility, regardless of when it was purchased or who purchased it. When Elderberry's counsel asked Dietrich whether she disagreed that some of the furniture that remained had been supplied by Elderberry, she responded that she did not disagree with that statement. Without evidence of what furniture or equipment, if any, was originally supplied by Elderberry, I cannot conclude that Continium conferred any benefit on Elderberry.[10] Accordingly, I will grant judgment in favor of Elderberry on Continium's counterclaim.

---

[10] I also find that Continium has not proven that the equipment left behind had value such that leaving it conferred a benefit on Elderberry. Pereira testified that much of the equipment was old, broken, or unusable, and that representatives of the new tenant felt that they "couldn't do anything" with what was left. Although Continium offered a number of photographs of furniture in an attempt to show that it was in good shape, I find that those photographs cannot by themselves prove that the equipment was indeed usable. Many of the photographs are dark, and the items depicted are necessarily reduced in size, making it very difficult to tell what condition the furniture was actually in.

Moreover, a picture cannot necessarily show the condition of a piece of furniture or equipment in the same way that a personal examination can. Pereira testified that the furniture and equipment that was discarded was in bad shape or not usable. By contrast, only Dietrich testified with personal knowledge about the state of the equipment at the time Continium abandoned the Facility. For a number of reasons, I find her testimony less convincing than that of Pereira and Elderberry's other witnesses. First, she was simply conducting an inventory of what was left in the facility, not determining whether that equipment could be used productively in an active nursing home. Second, Dietrich's testimony did not suggest that she has any particular familiarity with deciding what equipment could be used productively or sold for anything more than pennies on the dollar. Third and finally, the conflicts between her deposition testimony regarding the value of the furniture and her trial testimony raise serious doubts about her credibility on the issue. Ultimately, I find that the weight of the evidence is in favor of Elderberry on the issue of whether the furniture was in a condition such that leaving it behind conferred a benefit on Elderberry.

*c. Damages*

In general, under Virginia law, "[p]laintiffs bear the burden of proving with reasonable

certainty the amount of damages and the cause from which they resulted," and "speculation and

conjecture cannot form the basis of recovery." *DRC, Inc. v. Custer Battles, LLC*, 234 F. App'x

38, 42 (4th Cir. 2007) (unpublished) (quoting *Carr v. Citizens Bank & Trust Co.*, 325 S.E.2d 86,

90 (Va. 1985)) (internal quotation marks omitted). Elderberry seeks damages in the amount of

$2,742,029.50.[11] The total amount requested consists of the following components: (1) unpaid

rent for the period from April 2012 through August 2012 in the amount of $230,947.91; (2)

unpaid rent for the period from September 2012 through February 2013 in the amount of

$278,228.58; (3) a rent shortfall[12] from March 2013 through April 2017 in the amount of

$125,857.04; (4) unpaid taxes, utilities, and insurance premiums for the period from August

2012 through February 2013 in the amount of $136,451.36; (5) maintenance fees paid during that

same period in the amount of $18,525.06; (6) payments for architectural and construction

services in the amount of $166,183 to bring the Facility up to the fire code standards required by

the fire marshal; (7) $1,250,000 for payments to Nova, $588,708.60 of which was designated for

and spent on renovations and replacement furnishings required by Nova, and $661,291.40 of

which was designated as working capital required by Nova; (8) a $150,000 signing fee made to

Smith/Packett for its assistance in obtaining a new lease with Nova; and (9) a $375,000 value fee

scheduled to be paid to Smith/Packett on June 1, 2015, as part of the agreement Elderberry

signed to obtain Smith/Packett's assistance in acquiring a new tenant for the Facility. For the

---

[11] Elderberry also seeks attorneys' fees based on a provision in the Lease. I previously granted Elderberry's
unopposed motion to bifurcate the issue of attorneys' fees and therefore do not address that issue here.

[12] This shortfall is calculated by subtracting the amount of rent Elderberry is scheduled to receive from Nova under
the Nova Lease, accounting for all planned increases, from the amount of rent that Elderberry was scheduled to
receive from Continium under the Lease and Lease Amendment, again accounting for all planned increases.

reasons set forth below, I find that Elderberry has met its burden under Virginia law to prove the amount of damages it suffered and their cause with reasonable certainty. Accordingly, I hold that Elderberry is entitled to recover all of the damages it seeks.

### i. Damages Related to Unpaid or Lost Rent

As an initial matter, I note that Virginia law provides that there is no duty to mitigate damages when a commercial tenant abandons a lease in the middle of the term. *See Laskin Road Assocs., L.P. v. Capitol Indus., Inc.*, No. 2:07cv103, 2007 WL 1655336, at *6 (E.D. Va. June 5, 2007) (citing *Crowder v. Virginian Bank of Commerce, Inc.*, 103 S.E. 578, 579 (Va. 1920)). Under Virginia common law, once Defendants breached the lease by failing to pay rent, Elderberry had two possible remedies: (1) do nothing, and sue for accrued rents;[13] or (2) re-enter the premises, accept the tenant's surrender, and release the tenant from future liability on the lease. *See tenBraak v. Waffle Shops, Inc.*, 542 F.2d 919, 924 (4th Cir. 1976) (citing *Crowder*). Citing *tenBraak*, Defendants argue that they are not liable for any rent due after Elderberry re-entered the Facility.[14]

But *tenBraak* itself states that "[a]lthough the law of Virginia . . . does not provide for recovery of future damages for the lessor's losses arising from the abandonment of a contract of lease, we find that the parties are not barred from providing such a recovery through forfeiture provisions in the lease," which must be strictly construed. 542 F.2d at 924–25.[15] In a contract

---

[13] Had Elderberry pursued this remedy, it still could have recovered all of the rent that was due for the remainder of the term. Virginia law provides an exception to rules regarding claim-splitting to permit a lessor to evict a tenant without losing the right to recover a later deficiency incurred while seeking a replacement tenant. *See Virginia Dynamics Co. v. Payne*, 421 S.E.2d 421, 423 (Va. 1992). That "exemption serves the public policies of maximizing the lessor's use of land and minimizing the defaulting lessee's damages." *Id.*

[14] Defendants concede that Living Centers is liable for unpaid rent for the period from April 2012 through August 24, 2012.

[15] In so finding, the Fourth Circuit noted that it is "well recognized, both at common law and under the law of Virginia, that parties to a contract of lease may modify their legal rights by provisions in the lease." *Id.* at 925 n.8.

dispute, "the contract entered into constitutes the law governing the parties unless it violates public policy," *NENR Investments, LLC v. Starbucks Corp.*, No. 1:08cv00047, 2009 WL 1404732, at *4 (W.D. Va. May 18, 2009) (citing *Mercer v. S. Atl. Life Ins. Co.*, 69 S.E. 961, 962 (Va. 1911)), and parties can bargain for an appropriate remedy in the case of breach, *id.* Stated plainly, parties to a lease are free to negotiate their own remedies regarding breach, re-entry, and damages unless their agreement violates public policy.

Although Defendants acknowledge that a landlord and tenant can agree to provide for the recovery of future rents through an "acceleration clause," they nevertheless seek to avoid the enforcement of paragraph 7(3)(b) of the Lease. Defendants baldly assert that the Lease "contains no acceleration clause," but in fact the Lease expressly provides in paragraph 7(3)(b):

> Upon an uncured Default by the Lessee, and notice from the Lessor, the Lessor may reenter and resume possession of the Property. . . . The Lessor's reentry shall not be deemed either an acceptance or a surrender of this Lease or a termination thereof. It is expressly understood and agreed that in the event of the reentry by the Lessor by reason of default of the Lessee, *the Lessee shall nevertheless remain liable for the Rent and also for the taxes and insurance premiums payable by the Lessee as provided in this Lease, for the balance of the term herein originally demised.*

(Emphasis added.) Whether it is called an acceleration clause, a forfeiture provision, or something else, paragraph 7(3)(b) explicitly provides that when the lessor reenters the property after an uncured default by the lessee—the precise situation that occurred in this case—the lessee shall remain liable for the rent, taxes, and insurance for the balance of the lease term.

Perhaps recognizing that they need to find some principled basis to avoid the operation of contract language they negotiated and agreed to, Defendants suggest that the remedy provided for by paragraph 7(3)(b) would constitute a penalty that is not enforceable under Virginia law. As authority for this assertion, Defendants cite a Virginia Circuit Court opinion, *Teachers' Retirement System of Illinois v. American Title Guaranty Corp.*, 38 Va. Cir. 316 (Va. Cir. Ct.

1996), in which the court declined to enforce an acceleration clause because the court found the acceleration clause would impose a penalty rather than provide fair compensation for damages incurred. But the court in *Teacher's Retirement System* acknowledged that "Virginia courts recognize the legitimacy of an acceleration clause in the commercial lease context," and the court stated further that "the Virginia Supreme Court has declined to explicitly address whether an acceleration of rent is a valid liquidated damage or rather, an unenforceable penalty." Indeed, in *Virginia Dynamics Co. v. Payne*, 421 S.E.2d 421, 423 n.4 (Va. 1992), the Supreme Court of Virginia expressed no opinion regarding the validity of an acceleration clause as a possible penalty. *See also Snyder v. Exum*, 315 S.E.2d 216, 218 (Va. 1984). In fact, in *Payne*, the Virginia Supreme Court summarized *Snyder* as holding that if an acceleration clause is enforceable, "a lessor can still collect all the rent from the defaulting lessee even though he finds a new tenant for the balance of the term." *Payne*, 421 S.E.2d at 423.

In this case, Elderberry does not seek to impose a penalty on Defendants, nor does it seek to collect all of the rent from the defaulting lessee on top of the rent it will collect from its new tenant. Instead, Elderberry merely seeks to enforce a provision of the Lease that will allow Elderberry to recover the rent that it has lost and will lose as a direct result of the Continium Defendants' breach. In calculating its damages related to rent, Elderberry gave credit to Defendants for the rent Elderberry has received and will receive from its new tenant, Nova. Even though it had no legal obligation to mitigate its damages, Elderberry expended a significant amount of money, time, and energy to find a new tenant for the Facility and to bring it back into regulatory compliance, saving Defendants money and providing a service to the broader public by reopening the Facility as soon as was practicable.[16] Because the terms of the lease explicitly

---

[16] Elderberry's actions to re-let the property furthered the public policies of maximizing the productive use of land and minimizing the lessee's damages. *See Payne*, 421 S.E.2d at 423.

provide that Elderberry is entitled to recover all lost rent, and because I find that contractual term not only is not against public policy, but furthers public policy, I find that Elderberry is entitled as a matter of law to recover all unpaid rent from April 2012 through February 2013, and the rent shortfall from March 2013 through April 2017.

### ii. Damages for Unpaid Taxes, Utilities, and Insurance Premiums

Elderberry seeks to recover damages for payments made for utilities, real estate taxes, and insurance premiums that the lessee was required to pay under the Lease. Again, Elderberry seeks to recover damages only for the period after Continium stopped paying utilities, taxes, and insurance until March 2013, when Nova began paying them. Paragraph 3(2) of the Lease provides that the lessee shall pay "[a]ll utility services which may be provided to the [Facility], including but not limited to: water, sewer, gas, electric, telephone and garbage collection, as they from time to time shall accrue and be due and payable." Paragraph 3(4) provides that the lessee shall pay all real estate taxes, and paragraph 3(5) provides that the lessee shall pay premiums on all insurance required by the Lease. As a result of the Continium Defendants' breach of the lease, Elderberry had to pay utilities, real estate taxes, and insurance premiums during the period the Facility was unoccupied. The Lease required the Continium Defendants to pay these bills during the lease term, and had the Continium Defendants not breached, Elderberry would not have had to pay these bills. Thus, I find that Elderberry is entitled to recover $136,451.36 in damages for unpaid utilities, taxes, and insurance premiums.

### iii. Maintenance Fees

Elderberry paid Bob Pereira $18,525.06 to look after the Facility during the period between August 2012, when Continium abandoned it, and March 2013, when Nova re-opened it. Pereira provided general maintenance services and security, which I find was necessary to keep

the Facility from deteriorating further while it was being brought back up to code and into a condition that would allow it to reopen. Had the Continium Defendants not breached the Lease and abandoned the Facility, these payments would not have been required. I find that the payments to Pereira were necessary and incurred as a result of the Continium Defendants' breach. I will therefore grant Elderberry's request for these damages.

*iv. Payments Required to Meet Fire Code Requirements*

The provisions of the Lease required the lessee to maintain the Facility in good condition and to comply with all regulatory requirements imposed by local, state, and federal authorities. Specifically, paragraph 4(2) provided that:

> Subject to the duties placed upon the Lessor by Paragraph 5, the Lessee will keep the Property and any and all buildings and improvements (including inside and outside) which are now or may be erected or placed on said Property, in good order and repair subject to reasonable wear and tear at its sole cost and expense. All repairs and replacements shall be in quality and class at least equal to the original work. Lessee will pay when due all costs associated with any such repairs, replacements or other work undertaken by it, and will not suffer any mechanic's and/or materialmen's liens to be maintained against the Property. The Lessee shall also maintain and keep in good repair subject to reasonable wear and tear all personal property located on the Property.

Paragraph 4(5), which was referenced in paragraph 4(2), provided that at the expiration of the lease term, the lessee would leave the Facility "in the same condition as when demised to the Lessee, reasonable wear and tear and damage by fire or other casualty insured against being excepted." And paragraph 4(6) provided that the lessee would "comply with all lawful requirements of the Board of Health, Police Department, Fire Department, Municipal, State and Federal authorities respecting the manner in which it uses the Property, and that it will not suffer any nuisance or unlawful activity to be maintained or conducted on the Property."

Based on my findings of fact regarding the condition of the Facility when Continium abandoned it and the work required to bring it up to code, I find that the Continium Defendants failed

to properly maintain the Facility, and they failed to return the Facility "in the same condition as when demised," as required by the Lease. Most significantly, the Continium Defendants failed to "comply with all lawful requirements" of the fire marshal, which is a serious breach of the Lease that also posed a danger to the occupants of the Facility. As a direct result of the Continium Defendants' failure to comply with the terms of the lease, Elderberry had to pay $166,183.00 to Integrated Construction and Jones & Jones Architects to bring the Facility into compliance with local fire regulations. I will therefore grant Elderberry's request to recover those damages.

### v. Payments Made to Smith/Packett

Defendants do not object to the $150,000 signing fee charged by Smith/Packett for securing and negotiating the Nova Lease. Defendants do object to the value fee on the basis that it is speculative and uncertain, and they object to the value fee and the management fee on the basis that they are not damages that resulted from Defendants' breach of the Lease.[17] I reject both of these arguments. Based on the facts presented at trial, I find that it is reasonably certain that Elderberry will have to pay the value fee to Smith/Packett. The evidence shows that a new tenant is in place at the Facility, significant safeguards have been implemented to ensure that the tenant remains in place, and Defendants presented no evidence that remotely suggests that Elderberry will not have to pay the fee.

More importantly, Elderberry presented uncontroverted evidence that the pricing of the Asset Management Agreement it entered into with Smith/Packett—including the signing fee, the value fee, and the asset management fee—was a package. In other words, Elderberry would not have been able to obtain Smith/Packett's services in securing a new tenant without paying all

---

[17] Elderberry did not break out as a separate item the amount of money paid to Smith/Packett for the management fee provided for in the Asset Management Agreement. Instead, Elderberry accounted for that fee in its calculation of the rent shortfall. In determining the gap between what Elderberry would have received from Continium and what it is scheduled to receive from Nova, Elderberry calculated the Nova amounts based on what they would receive after Smith/Packett's management fee was paid. Thus, Elderberry has requested as part of its damages the management fee charged by Smith/Packett, but it accounted for that amount in its calculation of the rent shortfall.

three of those components of the total fee.  But for the Continium Defendants' breach of the Lease, Elderberry would not have needed to hire Smith/Packett at all.  The only reason Elderberry had to hire Smith/Packett was because the Continium Defendants breached the Lease and abandoned the Facility, leaving it in poor condition.  Moreover, the facts show that the Continium Defendants failed to maintain the Facility in good condition, making it harder for Elderberry to find a new tenant.   Had the Continium Defendants upheld their end of the bargain embodied in the Lease, Elderberry would not have incurred these damages.  I will therefore award Elderberry damages for all fees payable to Smith/Packett under the Asset Management Agreement.

### vi. Payments Made to Nova

The same reasoning applies as well to the damages related to the Nova Lease.  I have found as a matter of fact that Elderberry could not have secured the Nova Lease without promising to put up $1.25 million divided between the renovation budget and the working capital budget.  Again, I stress that Elderberry would not have had to put up any money at all had Continium fulfilled its obligations under the Lease.  Elderberry faced significant obstacles in finding a new tenant, and Elderberry got the best deal it could under the circumstances.  Like the fee structure in the Smith/Packett agreement, the payment structure in the Nova Lease was negotiated as a package.  The evidence shows that the $1.25 million that Elderberry had to pay Nova was the key to the agreement, not the particular split of that money between the renovation budget and the working capital budget.  Because I find that Elderberry could not have secured a new tenant without making those payments totaling $1.25 million, I conclude that Elderberry is entitled to recover that amount as part of its effort to mitigate its damages.

While I find that the total payments made to Nova were in fact a package, I will briefly address Defendants' concerns regarding the separate components. With respect to the renovation budget, I find that the evidence demonstrates that significant refurbishing of the Facility was necessary to secure the new tenant. The weight of the evidence shows that much of the furniture and equipment that was left at the Facility was not in good condition, and the new tenant felt that it was not usable. The Continium Defendants would not have been liable for the renovation budget had they maintained the Facility as they were required to under the Lease. I find that payments made by Elderberry to Nova for the renovation budget are therefore a reasonable component of costs incurred by Elderberry in its efforts to mitigate damages.

With respect to the funds provided by Elderberry to Nova as working capital, I again conclude that these payments were a necessary component of the damages Elderberry incurred in its effort to mitigate damages. Defendants' object to the inclusion of these payments in the damages calculation, arguing that Elderberry will recover the payments in the form of increased rent, and therefore damages relating to working capital would give Elderberry a double recovery. To support this argument, Defendants rely on the testimony of Scott Hillegass, who provided a number of calculations that were summarized in a demonstrative aid not entered into evidence.

The first problem with Defendants' argument is that their assertion that Elderberry will recover all of the money it gave Nova in the form of working capital relies on a time frame that goes well beyond the term of the original Lease. Accepting for the sake of argument that the rent increases based on the working capital provided by Elderberry would effectively repay those initial expenses, Elderberry would not recover the total amount of working capital provided until well, on April 30, 2017. That date falls in the middle of Year 5 of the Nova Lease. By that time, Elderberry would not have come close to recovering the full amount of the working capital it

provided to Nova, according to Defendants' demonstrative aid and Hillegass's testimony.  In fact, according to Defendants' own numbers, the amount recovered would be roughly $275,000,[18] well short of the $661,291.40 Elderberry provided.  It makes no sense for the Court to find that money that Elderberry will receive after the term of the Lease expires should be counted against the damages Elderberry is entitled to receive for breach of that same Lease.[19]  I find no basis in law or fact for accepting Defendants' argument.  If Defendants were correct that the rent increases resulting from provision of working capital effectively repay Elderberry for its original outlays, then those repayments should only be calculated through the end of the term of the original Lease.

More fundamentally, I reject Defendants' argument that Elderberry cannot recover as damages the working capital it provided to Nova because Elderberry will receive increased rent payments in the future as a result of providing the working capital.  The working capital is not a loan that gets repaid.  It was a payment that was part and parcel of a total amount of money negotiated to induce Nova into signing the Nova Lease.  It is true that Elderberry receives rent increases based on the amount of working capital provided.  But Defendants will receive the benefit of these increases.  When Nova has to pay higher rent due to increases based on working capital provided, the shortfall between what Nova pays and what Continium was supposed to pay will be reduced accordingly, and Elderberry will not receive any windfall.  In sum, I find that Elderberry is entitled to recover all of the money it gave Nova in the form of working capital

---

[18] I calculated this number by adding the recoveries listed on Defendants' demonstrative aid for Year 1 through Year 4, plus a pro-rated portion of the recovery listed for Year 5 to include the period through April 30, 2017, when the Lease was set to expire.

[19] Under this logic, Defendants might as well argue that Elderberry could have made a lot more money by entering a new lease in 2017, and therefore their damages should be reduced accordingly.

because that amount is necessary to put Elderberry in the position it would have been in had the Continium Defendants not breached the Lease.

### III. CONCLUSION

Based on all of the evidence presented at trial, I conclude that: (1) Living Centers assigned the Lease to FMSC, and that assignment satisfied Virginia's statute of frauds; (2) Continium did not prove its counterclaim for unjust enrichment, and Elderberry is entitled to judgment in its favor on that counterclaim; and (3) Elderberry is entitled to recover damages in the amount of $2,742,029.50. In light of my earlier decisions in this case regarding the effectiveness of the Guaranty and the assignment of the Lease from FMSC to Continium, I will enter judgment in favor of Elderberry against all Defendants, who are jointly and severally liable to Elderberry for damages in the amount of $2,742,029.50. Pursuant to 28 U.S.C. § 1961(a), I find that Elderberry is entitled to recover post-judgment interest at the rate of 0.13%. In addition, I find that Elderberry may also recover pre-judgment interest, at the same rate, on the amount of damages incurred as of the date that Nova occupied the Facility, March 1, 2013. As mentioned above, I previously granted Elderberry's unopposed motion to bifurcate the issue of attorneys' fees, and I will therefore reserve ruling on that issue until after the parties have briefed it.[20] An appropriate order accompanies this memorandum opinion.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

---

[20] Elderberry's motion for sanctions also remains pending. In light of developments that took place after Elderberry filed that motion, specifically the eleventh-hour production of the Assignment and Assumption of Lease document entered into evidence as Plaintiff's Exhibit 113 and the Sublease Agreement entered into evidence as Defendants' Exhibit 14, I will defer ruling on Elderberry's motion for sanctions to allow the parties to present additional evidence or argument on that issue.

Entered this ___6th___ day of September, 2013.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE